### COLONIALGROSSISTFORENING v. MOORE-McCORMACK LINES, Inc.

United States District Court
S. D. New York.
April 18, 1949.

· Haight, Deming, Gardner, Poor & Havens, of New York City (Thomas Roche, of New York City, of counsel), for libelant.

Wood, Molloy & France, of New York City (Melville J. France, of New York City, of counsel), for respondent.

RIFKIND, District Judge.

This was an action by the consignee of cargo against the carrier for the repayment to the consignee of additional freight paid under protest upon return of the cargo to the port of origin, after failure to discharge at the port of destination.

The amount in issue is $3,919.40, plus interest thereon from the date of payment. It has been stipulated between the parties on the trial that, if payment for the return voyage is required, the amount collected is reasonable.

The undisputed facts are that in March 1940 there was shipped on board respondent's vessel, The Flying Fish, at New York, 1,000 barrels of American Cane syrup, 900 of which were destined for delivery to the libelant, the consignee thereof, at Bergen, and 100 at Frondheim; that full freight for these shipments was paid in advance to the respondent, who signed and issued bills of lading; that the Flying Fish arrived at Bergen on March 27, 1940, and remained there or near there until April 23d, but neither of the shipments of syrup consigned to libelant was discharged or delivered; that on April 23d, the Flying Fish sailed for New York, still · carrying the aforementioned cargo; that on the vessel's arrival at New York, respondent refused to deliver the cargo unless additional freight amounting to $3,919.39 was paid; and that in order to obtain possession of the cargo, libelants paid the respondent, under protest, the additional amount demanded. Both the respondent's representative at Bergen and the master of the Flying Fish have died and the testimony of neither of them was available. However, I have received in evidence the log of the ship signed by the master and a file of correspondence between the respondent's shore representative at Bergen and the American Consul there, at least for the purpose of considering the instructions sent by the Consul to the vessel and its authorized agents.

From the evidence received it appears that the Flying Fish left New York on March 10th, arrived at Narvick on March 23d, and anchored in Bergen harbor on

---

March 27th. She docked on March 29th and commenced discharging cargo. The libelant's shipment had not yet been discharged when, on April 9th, the Germans invaded Norway, occupied Bergen, put an armed guard aboard the Flying Fish and ordered her to leave the dock and proceed to an anchorage. Although the guard was soon withdrawn, the vessel's movements and anchorage were subject to German naval control. Allied aerial counter-attacks on German naval and ground forces at Bergen followed and on April 12th the ship was machine-gunned. On April 15th she proceeded to Port Sandriken in Bergen harbor and anchored perpendicular to a pier, her stern lines being made fast thereto. Thereupon the American Consul ordered the ship's officers and crew ashore for their protection. Apart from occasional visits, they did not return aboard until ordered to do so by the Consul on April 22d, after he had arranged for her pilotage through the mine fields on her return voyage.

The simple fact is that the ship's master had no crew, officers, stevedores or steam by means of which to discharge libelant's cargo. This finding of inability is not refuted by the fact that from April 17th to April 19th another consignee's bulk oil cargo was discharged, for that consignee helped himself to the oil by means of his own shore gang, pipeline, and pumps. This libelant did not help itself to its cargo, although it had notice of the Flying Fish's presence and its agents were aboard on several occasions after April 15th but found no one in authority aboard, no personnel and no steam.

Clause 4 of the bills of lading for the libelant's shipments provided:

"4. In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the carrier or master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss, of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to begin or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port, [1] the master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the goods there, may, without giving any prior notice, discharge the goods into depot, lazaretto, craft or other place and the goods shall be liable for any extra expense thereby incurred; [2] or the master may proceed or return, directly or indirectly to or stop at such other port or place whatsoever as he or the carrier may consider safe or advisable under the circumstances and discharge the goods or any part thereof there without giving any prior notice and, when landed as herein above provided, the goods shall be at their own risk and expense, the delivery thereof by the carrier shall be considered complete and the carrier shall be freed from any further responsibility in respect thereof except to mail notice of the disposition of the goods directed to the shipper or consignee named in this bill of lading at such address as may be stated herein; [3] or the master may retain the cargo on board until the return trip or until such time as he or the carrier thinks advisable; [4] or the master may forward the goods by any means by water or by land, or by both such means, at the risk and expense of the goods. For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to a reasonable extra compensation."

When the dangerous and disadvantageous situation envisaged in the clause arose, the third alternative was adopted, and the cargo was retained on board and returned to the port of origin. While the first, second and fourth alternatives each allocates to the goods the expenses of its execution, the third alternative makes no mention of expense, presumably because carrying cargo on a return voyage, or storing it aboard for an additional length of time does not involve an "expense" to the carrier in the same sense that disbursement of storage charges ashore or of forwarding costs, envisaged in the first, second and fourth alternatives is an "expense". But the mas-

ter's adoption of any of the alternatives may be a "service" to the goods, and if it is, the carrier, by virtue of the final sentence of the clause, is entitled to reasonable compensation. This is peculiarly the case when the third alternative is adopted, for then the carrier renders the goods a "service" which, if rendered by anyone else, would be an "expense".

The cases dealing with "back freight" and "agency by necessity" are distinguished by the absence of such a specific contractual provision as is contained in the bills of lading here. Cf. Gillespie Bros. Proprietory, Ltd. v. Burns, Phillip & Co., Ltd., Sup.Ct. New South Wales, 1946, 79 Lloyd's List Law Reports 393; Brown v. Gaudet (Cargo ex Argos), (1873) L.R.P.C. 134, 2 Aspinall's Maritime Law Cases 6. Nor is the question here presented upon whom the cost of unloading should fall. Cf. The San Giuseppe, 4 Cir., 1941, 122 F.2d 579, 586, 587.

The libel is dismissed.