ORIENT MID-EAST LINES, INC.,
Plaintiff,

v.

COOPERATIVE FOR AMERICAN RELIEF EVERYWHERE, INC., Seventh Day Adventist Welfare Service, Inc., Church World Service, Inc., and Lutheran World Relief, Inc., Defendants,

and

United States of America, Defendant-Intervenor.

Nos. 6-65, 7-65, 22-65, 34-65.

United States District Court
District of Columbia.

July 31, 1967.

Supplemental Opinion Feb. 20, 1968.

Final Decree Feb. 23, 1968.

---

22. Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq.; Bowe v. Colgate-Palmolive Co. etc., n. 15, ante.

Wharton Poor, New York City, Marvin Coles, Stanley O. Sher, Washington, D. C., for plaintiff.

Allen Van Emmerik, Dept. of Justice, E. Grey Lewis, Asst. U. S. Atty., David G. Bress, U. S. Atty., Washington, D. C., for defendants.

OPINION

CORCORAN, District Judge.

This consolidated action is in the nature of a libel in admiralty for money due on bills of lading.

## I. THE PARTIES

The plaintiff Orient Mid-East Lines, Inc. is incorporated under the laws of Panama. At all times pertinent hereto it was the owner of the S.S. ORIENT MERCHANT and the time-charterer of the M.S. OLAU GORM.

The defendants, Cooperative for American Relief Everywhere, Inc. (CARE), Seventh Day Adventist Welfare Service, Inc., Church World Service, Inc., and Lutheran World Relief, Inc., are volunteer relief agencies to which the Commodity Credit Corporation (an agency of the United States) donated agricultural products under authority of 7 U.S.C. § 1431 for shipment abroad.

The United States, defendant-intervenor, entered the case with the consent of all parties as the real party in interest since it is required to pay all freight charges incident to any shipments of agricultural products donated to the defendant volunteer agencies (7 U.S.C. § 1723; 32 C.F.R. 202.2).

## II. THE DISPUTE

In the Fall of 1964 the defendant relief agencies entered into contracts of carriage (bills of lading) with the plaintiff carrier to transport U. S. donated agricultural commodities from Great Lakes ports to points overseas.

The route of ocean going vessels from the Great Lakes to the open sea is, of course, the St. Lawrence Seaway. Due to icing, the Iroquois Lock [1] of the Seaway was officially closed at midnight December 5, 1964, before the OLAU GORM and the ORIENT MERCHANT could make their way through it.[2] As a result the two ships were locked in the Lakes

---

1. The Iroquois Lock is located near Prescott, Ontario and is the exit lock from Lake Ontario, the easternmost of the Lakes, into the Seaway.

2. Two other vessels were locked in the Lakes during 1964, a Chinese-flag vessel, the VAN FU, and an American-flag vessel, the FLYING INDEPENDENT.

and ordered to Toronto for winter berthing.

The plaintiff thereupon, on or about December 9, 1964 telegraphed to the various shippers:

"THIS IS TO ADVISE YOU THAT BECAUSE OF FORCE MAJEURE THE ORIENT MERCHANT AND OLAU GORM ARE UNABLE TO LEAVE THE LAKES AS A CONSEQUENCE OF THE CLOSURE OF THE ST. LAWRENCE SEAWAY. THE VOYAGE HAS THUS BEEN TERMINATED AND THE FREIGHT EARNED. IN ACCORDANCE WITH YOUR REQUEST WE WILL LEAVE THE CARGO ON BOARD THE VESSELS DURING THE WINTER MONTHS. WE SHALL BE GLAD TO DISCUSS WITH YOU THE ADJUSTMENT OF A NEW FREIGHT TO APPLY FOR THE NEW VOYAGE." [3]

The above quoted notice by the plaintiff claiming a right to payment of full freight was founded upon the following pertinent clauses of the bills of lading:

"5.  In case of war, hostilities, * * ice or closure by ice, or the happening of any other matter or event, whether of like nature to those above mentioned or otherwise, whether any of the foregoing are actual or threatened and whether taking place at or near the port of discharge or elsewhere in the course of the voyage and whether or not existing or anticipated before commencement of the voyage, which matters or events, or any of them, in the judgment of the Master or carrier may result in damage to or loss of the vessel * * *, or make it unsafe or imprudent for any reason to proceed on or continue the voyage or enter or discharge cargo at the port of discharge, or give rise to delay or difficulty in reaching, discharging at or leaving the port of discharge, the carrier or Master may * * * (2) whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the goods there, discharge the goods into depot, lazaretto, craft, or other place; or (3) proceed to return, directly or indirectly, to or stop at any port or place whatsoever, in or out of the regular route and short of or beyond the port of discharge as the Master or the carrier may consider safe or advisable under the circumstances and discharge the goods, or any part thereof at any such port or place. When the goods are discharged from the ship, as herein provided, they shall be at the risk and expense of the shippers and/or receivers; such discharge shall constitute complete delivery and performance under this contract, full bill of lading freight and charges shall be deemed earned and the carrier shall be freed from any further responsibility.  For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to extra compensation, for which, together with any unpaid freight and charges, the carrier shall have a lien on the goods.

"* * *

"13.  The terms of this bill of lading constitute the contract of carriage * * *
"* * *

"31.  Full freight hereunder to port of discharge or port of destination, if anmed, shall be considered completely earned on receipt of the goods by the Carrier, whether the freight be stated or intended to be prepaid or to be collected at destination;  and the

---

3.  This telegram was sent to CARE and Church World Service.  Except for omission of reference to the OLAU GORM, the same telegram was sent to the Seventh Day Adventists and Lutheran World Relief.

Carrier shall be entitled to all freight and charges due hereunder, whether actually paid or not, and to receive and retain them under all circumstances whatsoever ships and/or cargo lost or not lost.

"If there shall be a forced interruption or abandonment of the voyage at the port of shipment or elsewhere, any forwarding of the goods or any part thereof by vessels of the same line or otherwise shall be at the risk and expense of the goods."

Lutheran World Relief had prepaid the freight on its shipments prior to the icing-in. CARE, Church World Service and Seventh Day Adventist had not prepaid but had executed "due bills" acknowledging receipt of bills of lading which Orient Mid-East marked "freight prepaid." These due bills provided in part:

"Receipt is hereby acknowledge [sic] of Prepaid, negotiable sets of Bills of Lading per _____ numbered as follows without payment of freight, and in consideration of the acceptance by Orient Mid-East Lines of this Due Bill, it is herewith expressly agreed to pay ocean freight charges in U. S. Currency as undernoted within seventy-two hours after date, the vessel to have a lien on the cargo for full amount of ocean freight charges plus any expenses incidental to the collection thereof until payment has been effected."

Following the berthing of the ships in Toronto, a dispute arose as to the freight due under the bills of lading and the due bills.

The shippers and carrier thereupon entered into negotiations which resulted in an agreement dated March 3, 1965. The parties have stipulated to the following summary of that agreement:

"CARE, Church World Service, Seventh Day Adventists and Lutheran World Relief, having requested Orient Mid-East to retain the cargo on board throughout the period the vessels would be locked into the Lakes,[4] undertook to surrender the bills of lading originally issued and to pay the carrier the full freight due under the bills of lading first issued unless such freight had already been paid. Orient Mid-East, on its part, undertook to have new, second bills of lading issued, * * * and agreed that the OLAU GORM and ORIENT MERCHANT would perform the voyages in accordance with the terms of the second bills of lading when the Seaway opened for navigation in the Spring of 1965. The parties also agreed that if they were unable later to agree upon the amounts, if any, due the carrier in addition to the freight already paid, any party could institute suit in a United States court of competent jurisdiction for resolution of that issue 'all parties retaining all rights and defenses they presently have, and this agreement, issuance of the second bills of lading, and the payment provided for in article 1 above shall not be deemed to affect, waive or alter the rights or defenses of any party.' They also agreed therein that 'the failure of the Carrier physically to exercise any of its claimed rights, including the asserted right to discharge at Great Lakes ports or elsewhere, shall not be deemed to affect or diminish the amounts and/or remuneration to which the Carrier may be entitled under the contracts of carriage as evidenced by the second

---

4. Throughout the period when the ORIENT MERCHANT and OLAU GORM were berthed at Toronto, plaintiff stored and cared for the cargo, and informed defendants that it was rendering services thereto. During trial the Government conceded that by storing and caring for the cargo on board, plaintiff rendered a valuable service to defendants. The question of how much plaintiff is entitled to recover for these services is not presently before the Court but will be considered in later proceedings.

bills of lading and/or the bills of lading first issued.' "

Defendants CARE, Church World Service and Seventh Day Adventists thereafter paid the freight due under the first bills of lading on dates and in the amounts indicated below:

|  | DATE | AMOUNT |
|---|---|---|
| CARE | March 16, 1965 | $202,601.32 |
| Church World Service | March 10, 1965 | 165,968.64 |
| Seventh Day Adventists | March 19, 1965 | 11,694.92 |

---

Lutheran World Relief, as pointed out above, had prepaid the freight it owed in the amount of $2,589.42.

The compromise having been reached the OLAU GORM sailed from the Great Lakes in April 1965 and completed her voyage as originally intended without incident.

The ORIENT MERCHANT cleared Toronto, loaded additional cargo for the defendant agencies at other Great Lake ports, but thereafter on April 27, 1965 ran aground. Her cargo was off-loaded in Toronto and the ship was declared a constructive total loss.

The basic dispute arising out of the facts as recited is over the question of so-called "second freight."

The plaintiff carrier asserts that since its ships were closed in by ice it is entitled under Paragraph 5 and 31 of the bills of lading not only to what the parties have designated as "first freight" (i. e., the freight paid in connection with the original loading of the vessels) but also to what the parties have designated as "second freight" (i. e., an additional freight for completion of the voyage from Toronto).

The defendant United States claims that notwithstanding the exculpatory provisions of the bills of lading the carrier is entitled to the "first freight" only and has no valid claim to an additional "second freight." Its position is that although the plaintiff vessels were locked in the Lakes as a result of ice, the plaintiff was at fault in that it acted in total disregard of repeated warnings from the Seaway Authority to clear the ships be-

fore ice set in, that the plaintiff gambled unreasonably on the weather, and having lost the gamble, cannot now shift the risk to the shippers notwithstanding the exculpatory provisions of the bills of lading.

Both parties concede that there is a degree of negligence which might thwart the strict application of the exculpatory provisions of the bills of lading. The parties are in dispute, however, as to whether there is in fact negligence in this case, and if so whether that negligence is of a sufficient degree to have the effect of defeating the provisions of the bills. We turn accordingly to a more detailed review of the circumstances which led to the lock-in of the two ships.

The St. Lawrence Seaway is operated by the St. Lawrence Seaway Authority, a Canadian instrumentality headquartered at Cornwall, Ontario. It is solely responsible for deciding when conditions require closing of the Seaway.

On November 2, 1964 the Seaway Authority issued "Notice No. 10 of 1964" to all carriers listing the formal closing dates of the various Seaway canals between locks. It designated November 30, 1964 as the closing of the Iroquois Canal, but further added that "weather and ice conditions could force the Seaway to be closed earlier." The notice stated further that if climatic conditions permitted operations would be continued past the stated date but " * * * obviously subject to close on very short notice." Further the notice stated:

"Masters and owners of ocean vessels are advised that it is their responsibility to schedule their passage to en-

sure clearing the South Shore Canal at St. Lambert before the closing date if they wish to avoid being forced to winter above Montreal, should an early freeze occur this year, as it has in a a number of years past."

The year 1964 was predicted to be, and, as it turned out, was a severe year, more so than previous years. By November 25 the concern of the Seaway Authority was such that it telegraphed all registered agents of carriers operating in the Great Lakes requesting information on expected departures of their ships. This telegram was sent to the Hurum Shipping and Trading Company, Ltd., plaintiff's Canadian agent. It read:

"CORNWALL

ONT 25 1129AM EST
"HURUM SHIPPING BOARD OF TRADE BLDG
300 ST SACREMENT ST MTL QUE
IN THE BEST INTERESTS OF ALL CONCERNED WE RESPECTFULLY REQUEST ETA OF OCEAN VESSELS FOR SEAWAY TRANSIT RE APPROACHING CLOSING OF THE 1964 NAVIGATION SEASON 1 ETA UPBOUND ST LAMBERT LOCK ONE 2 ETA DOWNBOUND PORT COLBORNE LOCK EIGHT 3 ETA DOWNBOUND IROQUOIS LOCK SEVEN[5]

D MACKENZIE ST LAWRENCE SEAWAY AUTHORITY
ETA 1964 1 ETA 2 ETA 3 ETA
NOV 25/64/1145AKN
TALASHIP MTL"

Hurum Shipping replied:

"ST. LAWRENCE SEAWAY AUTHORITIES
ATT MR D MACKENZIE
CORNWALL ONTARIO
"REYOUR CABLE VESSELS TRANSIT STOP UPBOUND NIL STOP DOWNBOUND MS MALMANGER ETA IROQUOIS NOV 27/28TH AND MT JONTOS ETA IROQUOIS NOV 28TH *REGARDING ORIENT MERCHANT AND OLAU GORM PRESENTLY IN LAKES CONTACT OUR PRINSIPALES ORIENT MID EAST LINES NEW YORK* [Emphasis supplied]
HURUM SHIPPING AND TRADING BOARD OF TRADE BLDG
MONTREAL PQ"

The Seaway Authority then made telegraphic inquiry of Orient Mid-East Lines and was notified on November 25:

"YOURS TODAY ETAS 1 NONE 2 OLAU GORM SEVENTH ORIENT MERCHANT SIXTH 3 OLAU GORM EIGHTH ORIENT MERCHANT SEVENTH RESPECTFULLY REQUEST IMMEDIATE ADVICES EVENT AUTHORITIES DECIDE CLOSE SEAWAY SOONER IN ORDER ATTEMPT ALTER ARRANGEMENTS."

This reply is conceded to mean that Orient Mid-East had no ships upbound or entering the Lakes; that the expected time of arrival of the OLAU GORM at the Port Colborne Lock on the Lake Erie side of the Welland Canal (between Lakes Erie and Ontario) was December 7, 1964; that the expected time of arrival of the ORIENT MERCHANT at Port Colborne Lock was December 6, 1964; that the OLAU GORM was expected to arrive at Iroquois Lock on December 8, 1964 and the ORIENT MERCHANT on December 7, 1964.

■ The plaintiff's request for "immediate advices event Authorities decide close Seaway sooner" is of special significance because the plaintiff steadfastly maintains that it was entitled to and did place almost total reliance on this request

---

5. ETA upbound St. Lambert Lock means expected time of arrival upbound at St. Lambert Lock which is the Lock nearest Montreal. ETA downbound Port Colborne, Lock 8, means the expected time of arrival at the Lock at Port Colborne on the Welland Canal on the Lake Erie side of the Welland Canal. ETA downbound Iroquois Lock, No. 7, means the expected time of arrival, downbound, at Iroquois Lock which is the first lock through which a vessel passes when leaving Lake Ontario through the Seaway to Montreal.

in scheduling the departures of the OLAU GORM and the ORIENT MERCHANT.[6]

There was no further direct exchange of telegrams between the Seaway Authority and the plaintiff.

As any shipping season draws to a close, it is customary for the Seaway Authority to keep carriers apprised of the impending closing of the Seaway by sending telegrams to the Shipping Federation of Canada (representing the ocean trade)[7] and to the Dominion Marine Association (representing the inland trade).

The telegrams include a comparison of current water temperatures with those on the same date in the previous year. The most critical temperatures are those at the St. Lambert Lock. The telegrams also show the number of vessels remaining in the Lakes above St. Lambert because of the effect this may have on the time necessary to exit the Seaway and to avoid a line-up at one end of the Seaway.[8]

In the course of November and December 1964 the following information was released to the trade:

| DATE OF ADVICE | WATER TEMPERATURES 1963 | 1964 | NO. OF OCEAN SHIPS ABOVE ST. LAMBERT |
|---|---|---|---|
| November 23 | 44.0 F° | 36.0 F° | 93 |
| November 25 | 43.0 F° | 34.5 F° | 123 |
| November 26 | 41.0 F° | 35.0 F° | 119 |
| November 27 | 41.0 F° | 34.5 F° | 113 |
| November 30 | 40.0 F° | 34.5 F° | 83 |
| December 2 | 36.0 F° | 32.0 F° [9] | 67 |
| December 4 | 34.0 F° | 32.0 F° [9] | 39 |

A telegram of November 26, 1964 to the Shipping Federation of Canada demonstrated a greater than normal urgency. It stated in part:

" * * * The St. Lawrence Seaway Authority has issued an urgent warning to ocean vessels to make arrangements to clear the system by the official closing date, November 30, previously announced.

" * * * A continuance of present weather trends could bring about a forced closing on very short notice.

"Thus, it is important, particularly to ocean ships, in order that they may avoid the possibility of being trapped in the Great Lakes, to take into account present climatic conditions and to schedule their departure from Seaway waters accordingly."

Additionally a telegram of December 4, 1964 warned:

"ICE IS SLOWING SHIP TRANSITS AT ST. LAMBERT."

Trade journals carried articles on the imminent Seaway closing.

Mr. Orestes Pendias, General Manager of the Orient Mid-East Lines, was charged with the routing of the OLAU GORM and the ORIENT MERCHANT. There

6. The plaintiff also asserts reliance on the fact that the tentative date for closing in previous years had always been November 30, but in fact the canals had remained open and that actual freezing dates had always been later than December 5. Since closing is directly related to prevailing weather—and weather is not yet precisely predictable—the Court deems this reliance to be patently unreasonable.

7. As noted at p. 9, supra, Hurum Shipping, plaintiff's Canadian agent, was a member of this Federation.

8. The Seaway reportedly can hold about 30 ships per day (15 in each direction) at the St. Lambert end but cold weather may greatly reduce this number.

9. No measurements are taken below 32°—freezing point.

seems to be no doubt that he had access to all the information indicated above. Further, Captain John Butt, Senior Ship Inspector of the Seaway Authority, testified that he telephoned Eagle Ocean Transport, plaintiff's agent in New York on December 1 on instructions of Mr. Burnside, the Director of Operations and advised the plaintiff to "get his ships on the move to get out of the Seaway." Mr. Pendias denied such a call [10] but acknowledged that he placed a telephone call to the Seaway on December 2, 1964.

The undisputed call of December 2nd was taken by Mr. Donald MacKenzie, Special Assistant to the Director of Operations of the Seaway. He testified that he advised Pendias in the course of that conversation "that if these ships were mine I would not want them farther away than Port Colborne and on their way downbound.[11]

In the meantime the ships were proceeding as follows: The ORIENT MERCHANT was taking on cargo at Milwaukee as late as November 26, 1964. It cleared Milwaukee for Chicago November 27th. It took on cargo at Chicago, leaving on December 1st, but then returned to Milwaukee for still more cargo. It arrived Milwaukee December 2nd and departed December 3rd. It arrived Detroit December 5 and at Port Colborne December 6th. It did not reach the Iroquois Lock until December 7.

The OLAU GORM arrived Milwaukee November 23 and cleared for Chicago on November 25. It departed Chicago November 29, arriving at Green Bay November 30. It departed Green Bay December 1 and arrived Buffalo December 5 to take on additional cargo. It left Buffalo 10:55 P.M. December 5 and stopped at Kingston December 7 before proceeding to Iroquois Lock at Prescott.[12]

The Seaway Authority reached its decision to close finally on December 5 and began broadcasting at 2:00 P.M. that date and at four-hour intervals that the Seaway would close at midnight December 5. Orient Mid-East asserted that neither ship heard these broadcasts.

The last downbound ship to transit Iroquois Lock cleared December 6 at 0048 hours. The last downbound ship cleared the Seaway at St. Lambert on December 7, 1964.

## III. DISCUSSION

■ Historically, maritime law made the carrier of goods by sea absolutely responsible for safe delivery of the cargo unless loss or damage or nondelivery was caused by an Act of God, or of a public enemy, or by the inherent vice of the goods provided that in any such exceptional case the carrier was not negligent or otherwise at fault.[13] The natural consequence of that principle is that ocean freight charges are not earned unless and until the goods are delivered to their intended destination. Alcoa S. S. Co. v. United States, 338 U.S. 421, 70 S. Ct. 190, 94 L.Ed. 225 (1949); Grammer S. S. Co. v. James Richardson & Sons, 37 F.2d 366 (W.D.N.Y.1929) aff'd 47 F. 2d 186 (2d Cir. 1931).

Because of the harsh consequences of this rule of absolute liability carriers began inserting exceptive or exculpatory clauses into bills of lading. Contractual provisions establishing the shipper's lia-

10. The fact that such a call did take place is corroborated by other evidence. A switchboard operator's work sheet and a telephone bill both show a call made from the Seaway Authority on December 1, 1964.

11. Mr. Pendias understood that Mr. MacKenzie gave him no encouragement to keep the vessels in the Lakes, but according to Mr. Pendias' testimony he was led to believe that if he met his planned exit dates he would be allowed to transit the Seaway. The testimony is contrary to all other evidence showing concern by the Seaway authorities of an early freeze-up.

12. When Mr. Pendias requested immediate advice on closure of the Seaway he did not specify that he would need four days advance notice.

13. Carver, Carriage of Goods by Sea (9th Ed. 1952); Gilmore and Black, The Law of Admiralty, at 119 (1957).

bility for freight regardless of actual delivery have now become common in bills of lading and have uniformly been held valid. Allanwilde Transport Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312 (1919).

However, from the outset the courts have held that the exemptions from liability conferred by such clauses are subject to the overriding obligation on the part of the carrier to use due care in respect to cargo and to furnish a seaworthy ship at the inception of the voyage.[14]

The bills of lading here in dispute include accepted exculpatory provisions (supra) and on their face such provisions would appear to offer absolute protection to the carrier under the circumstances of this case, i. e., a lock-in by reason of ice. However, even the plaintiff acknowledges that absolute protection does not exist and that its claims could be defeated by a showing that the plaintiff's ships were locked in because of the plaintiff's reckless or arbitrary conduct. The defendants on the other hand would assert that the plaintiff must exercise the skill of a reasonably prudent carrier under all the circumstances before it can retain freight while abandoning the voyage, and that the plaintiff may not rely upon circumstances of which it was or should have been aware as grounds for excusing the nonperformance of the voyage.[15]

Significantly both parties cite the same cases in many instances to support their respective positions, and it is true that language can be isolated from the various cases which would seem to afford some comfort to both. Upon analysis of all the leading cases, however, the Court deduces that there is a common standard of conduct prescribed if a carrier is to be afforded the protection of the exculpatory provisions. The Court finds that standard to be that to afford itself the protection of the exculpatory clauses of the bills of lading the carrier must exercise reasonable judgment under the circumstances existing and reasonably foreseeable at the time the judgment is made. In other words the exculpatory clauses do not confer a license to disregard the likely or the obvious.

This standard is not inconsistent with that set forth in De La Rama S. S. Co. v. Ellis, 149 F.2d 61 (9th Cir. 1945), which is cited by the plaintiff as "perhaps the most illuminating discussion of the standard by which a carrier's conduct should be measured." That case is illuminating but we do not hold to the plaintiff's contention that it stands for the proposition that anything short of gross negligence or arbitrary or reckless conduct would exculpate the carrier. In that case the bill of lading contained a prepaid freight clause purporting to shift the risk of forced abandonment of the voyage from the carrier to the shipper. The carrier continued to load a shipment at New York destined for the Philippines after receipt of the news of the attack on Pearl Harbor. After the cargo was loaded the customs authorities refused to clear the vessel. The cargo was unloaded and the voyage abandoned. In the ensuing litigation the District Court held that it was unreasonable on the part of the carrier to continue loading in view of the news of Pearl Harbor, but the Court of Appeals reversed and stated:

> "We are not able to agree that the responsible agents of the carrier acted *arbitrarily* in light of the facts coming to their knowledge * * *" (Emphasis supplied)

14. Gilmore & Black, op. cit. supra at 120.

15. Interestingly, the plaintiff, while insisting that liability can only attach to gross negligence—or arbitrary or reckless conduct—asserts that even if the standard of care is ordinary negligence the facts will show that the frustration of the voyage was a result of ice closure and that there was no negligence on the part of the carrier. Possibly out of an abundance of caution the defendants too modify their stand to assert that while the standard of care is one of ordinary negligence, the plaintiff was in fact grossly negligent and acted recklessly and arbitrarily. Each side also seeks to cast the burden of proof upon the opposing party.

The appellate court considered the judgment of the carrier to be a reasonable one under the circumstances since at the time that the decision had to be made whether to proceed with or to abandon the voyage the public mind was unprepared for the swift deterioration which was to take place. In using the word "arbitrarily" the appellate court did not thereby adopt such a standard as is advanced by the plaintiff. As a matter of fact and significantly the Court stated:

> "What the shipper had the right to demand of the carrier was, not infallibility, but the exercise of a *reasoned judgment of the situation as it appeared at the moment,* having regard to the rights of all concerned." citing The Styria, 186 U.S. 1 at 9–10, 22 S. Ct. 731, 46 L.Ed. 1027 (1902), The Wildwood, 133 F.2d 765 (9th Cir. 1943). (Emphasis supplied)

■ In considering whether the exercise of judgment is reasonable under all the circumstances the Court should, as was done in *The Wildwood,* supra at 771, place some reliance on what effort is made to obtain necessary and available information upon which a reasoned judgment can be made.

■ The same principle of "reasoned judgment" under the circumstances as they exist or as are reasonably foreseeable at the time the judgment is made permeates all the other leading cases cited by either party. Thus, a deviation may be reasonable and permissive if, *after* a voyage is commenced, unforeseen circumstances arise which would make it imprudent or impossible to continue. The Wildwood, 133 F.2d 765 (9th Cir. 1943); Hirsch Lumber Co. v. Weyerhaeuser S. S. Co., 233 F.2d 791 (2d Cir. 1956); Colonial Grossistforening v. Moore-McCormack Lines, 83 F.Supp. 464 (S.D.N.Y.1949), aff'd 178 F.2d 288 (2d Cir. 1949); De La Rama S. S. Co. v. Ellis, 149 F.2d 61 (9th Cir. 1945); Kroll v. Silver Line Limited, 116 F.Supp. 443 (N.D.Cal.1953).

■ However, notwithstanding the existence of exculpatory clauses the courts will not grant protection to a carrier who makes a deviation when the risks encountered were known to the carrier at the commencement of the voyage and the deviation is found to be unreasonable. Surrendra (Overseas) Private, Ltd. v. S. S. Hellenic Hero, 213 F.Supp. 97, 102 (S.D.N.Y.1963), aff'd 324 F.2d 955 (2d Cir. 1963) (unusual congestion at a distant port of destination).

■ Nor will the courts grant the protection of an exculpatory clause where a voyage becomes frustrated through the fault of the carrier. Merchants Corp. of America v. 9655 Long Tons, More or Less, of No. 2 Yellow Milo, 238 F.Supp. 572 (S.D.Tex.1965).

## IV. CONCLUSION

■ Applying the foregoing principles to the facts at hand the Court can only conclude that the plaintiff Orient Mid-East did not use reasoned judgment in failing to heed the repeated warnings of the impending freeze and in delaying the arrival of its vessels at the critical lock before the freeze actually took place. It will be recalled that Pendias claims to have relied upon the Seaway Authority to answer his request for futher information. But Pendias had no right to put the burden on the Seaway Authority. It as a public agency was not required to service individual shippers in this manner.

It is obvious that the Seaway Authority did use every reasonable effort to bring home to carriers and their agents the danger of the freeze that would cause the closure of the Seaway. There is no doubt that these warnings were brought home to the plaintiffs, and there is no doubt that had the plaintiff heeded the warnings both of its vessels would have cleared the Seaway.

Under all the circumstances the Court finds that the plaintiff did not act reasonably and that accordingly the plain-

tiff is not entitled to the "second freight."[16]

## SUPPLEMENTAL OPINION

Reference is made to an earlier opinion of this Court in this matter dated July 31, 1967. By agreement of the parties that initial opinion was limited to a consideration only of alleged liability of the defendant for so-called "second" freights and left open other questions treated below dealing with damages for freight stored and for interest earned.

### I.

On October 6, 1967 counsel for the parties met with the Court *in camera* to discuss the conduct of future proceedings concerning the damage claims. In the course of that conference counsel for the plaintiff called the attention of the Court and of Government counsel to Clause 25 of the bills of lading, and suggested that in view of the Court's reasoning in its opinion of July 31, 1967, Clause 25 might be applicable to exculpate the plaintiff from any wrongdoing on its part and thereby entitle it to the so-called "second" freights notwithstanding the earlier findings of the Court. Clause 25 was included in the bills of lading which were originally before the Court, but had never been adverted to at any time either in brief or argument in the course of this protracted litigation. In view, however, of the represented importance of the clause (and the parties consenting) the Court agreed to accept briefs on its applicability to the plaintiff's claim to "second" freights.

### II.

Clause 25, now in issue, reads as follows:

"Negligence Clause

"It is intended that all the terms of this contract including all exemp-

tions from liability shall be valid, enforceable and available to the carrier so far as and whenever the applicable law will permit even where there has been negligence or unseaworthiness for which the carrier is chargeable and that in all instances where it may be possible to contract against the consequences of negligence or unseaworthiness, the Carrier, although negligent, or the ship be unseaworthy, shall not be under any liability whatever."

Applying the foregoing language the plaintiff argues:

(a) That all bill-of-lading exemptions of liability are valid even when the carrier is proven negligent;

(b) That this Court has held the plaintiff carrier negligent [1] in this particular case in not clearing the Great Lakes before ice closure and therefore

(c) The plaintiff's negligence cannot defeat its claim to the second freights.

The Court does not agree.

The plaintiff presents no authority directly in point to support its position but attempts to sustain its theory by analogy to cases arising under the provisions of the Harter Act [2] and the Carriage of Goods by Sea Act [3] (Cogsa). In every case cited by the plaintiff to support this position, however, there was a question of the *liability of the carrier* for damage to cargo, for mismanagement of the ship, or for other circumstances excepted by the bills of lading. The Court does not argue with these cases; they clearly fall within the purview of the exceptive clauses of the Harter Act and

16. By agreement of the parties certain other damage claims have been left open. They will be the subject of further inquiry.

1. The Court's finding that the plaintiff failed to exercise reasoned judgment un-

der all the circumstances, read in context, is hardly to be equated with mere negligence.

2. 46 U.S.C. §§ 190–195.

3. 46 U.S.C. §§ 1300–1315.

Cogsa. But, and the distinction is controlling, it must be pointed out that there is no issue of *liability of the carrier* or the carrier's ship present in the instant case. No one asserts *liability* against the carrier or its ship. The Court finds a very sharp distinction between a clause granting an *exemption to the carrier from liability* under exceptive circumstances and a situation where a carrier *asserts an affirmative claim of liability* against another for full freight notwithstanding non-performance of the voyage. In the opinion of this Court Clause 25 was never intended to apply to such a situation. The Court accordingly reaffirms its original decision unaltered by the existence of Clause 25.

### III.

Throughout the period the ORIENT MERCHANT and OLAU GORM were berthed at Toronto, plaintiff, at the request of the various nominal defendant relief agencies, stored and cared for the cargo aboard ship. The defendants admit these services were beneficial to the cargo. The question now presented is how much, if anything, the plaintiff is entitled to recover for performing the services.

At trial the plaintiff took the position that when the freeze-up occurred, the voyage terminated, with full freight earned and that it had the right to off-load the cargo at the nearest available port but that it retained cargo aboard at the behest of the defendants. The plaintiff accordingly alleged that it was entitled to receive for ship storage whatever it would have cost the defendants for shore storage at facilities in Toronto. That claim was of necessity precluded by the Court's holding in its original opinion.

In view of the Court's prior conclusion the plaintiff shifts ground to allege now that it is entitled, in effect, to the cost of storing that portion of the goods which would have been left behind had the plaintiff taken the proper precautions to exit the Seaway prior to the freeze-up. In other words the plaintiff alleges that the defendants benefited by the plaintiff's misconduct to the extent that the defendants were relieved of either over-winter storage at loading point, or overland travel cost to an ocean port for further shipment. This reasoning places a premium on the benefits to the defendants but fails to consider the plaintiff's failure to complete delivery and fails to place any culpability on the plaintiff for its misconduct. This reasoning also overlooks the plaintiff's principal and most obvious economic motive in delaying in the Lakes as long as possible in order to load the greatest amount of cargo. Clearly this was not to relieve the defendants of overwinter storage costs.

The Court is of the opinion that the plaintiff did not have the right to terminate the voyage at Toronto, off-load the cargo and retain the freight paid. During the winter freeze-up the plaintiff had a duty to care for the cargo in a reasonable manner by the least expensive method. It could retain the goods on board its vessels or take some less costly reasonable alternative. When the plaintiff agreed to retain the goods aboard ship at the request of the defendants it therefore became entitled to that amount by which the cost of such storage exceeded the cost of any other reasonable method of custody.

By a recent submission dated February 13, 1968 counsel for the plaintiff have conceded "that the cost to the ship incurred by the need to care for the cargo aboard would not exceed the cost of storage ashore."

This issue is therefore resolved.

### IV.

One final issue remains to be treated in this case. The bills of lading issued on each contract of carriage required that freight charges be prepaid. Prior to the freeze-up defendant Lutheran World Re-

lief had prepaid the freight on its shipments. CARE, Church World Service and Seventh Day Adventist had not prepaid their freight charges but had executed "due bills" which are set out in pertinent part on page 5 of the Court's original opinion. Following the freeze-up of the Seaway and closure, the freight charges due under the bills of lading were disputed.

This dispute was resolved by an agreement of March 3, 1965 and the freight was eventually paid on March 10, 16, and 19, 1965 as set forth at page 6 of the original opinion.

■ These freights were due prior to the ice closure and the plaintiff is entitled to interest at the rate of 6% from the due date of payment under the due bills until the actual date of payment plus all reasonable costs incurred by plaintiff to effect recovery. The parties have stipulated that the plaintiff is entitled to interest is the amount of $6,083.39 and collection fees of $7,460.51, or a total of $13,543.90.

### FINAL DECREE

Pursuant to the Opinion and Order of this Court dated July 31, 1967, and entered on August 1, 1967, and pursuant to the supplemental Opinion thereto dated February 20, 1968 it is hereby:

Ordered, adjudged, and decreed that plaintiff's causes of action for second separate freights for carrying the cargoes here involved and for compensation for the overwinter storage of such cargoes are dismissed; and it is further

Ordered, adjudged, and decreed that plaintiff shall recover from defendant United States the sum of $13,543.90 on plaintiff's cause of action for collection expenses and interest on freights earned for carrying such cargo but not timely paid; together with interest at Four Percent (4%) from March 22, 1965 until paid; and it is further

Ordered, adjudged, and decreed that each party shall bear its own costs.