## DE LA RAMA S. S. CO., Inc., v. ELLIS.

### No. 10701.

Circuit Court of Appeals, Ninth Circuit.

March 1, 1945.

Rehearing Denied April 4, 1945.

---

Graham & Morse and Clarence G. Morse, all of San Francisco, Cal., and Herbert M. Statt, of New York City, for appellant.

Abraham Setzer, of San Francisco, Cal., for appellee.

Before GARRECHT, MATHEWS, and HEALY, Circuit Judges

HEALY, Circuit Judge.

Appellee sued in a California court to recover possession of certain glassware and for damages for its detention. Upon removal of the cause appellant asserted a counterclaim on account of earned freight in the sum of $3,772. The trial eventuated in a judgment in appellee's favor for the recovery of the glassware or its value.

Appellee, whose headquarters are at San Francisco, is an exporter and importer of merchandise to and from the Philippine Islands and other places in the Far East. Appellant is a Philippine corporation with its main office at New York City. It owned, among other vessels, the Philippine motor ship Dona Aniceta. In November of 1941 an oral engagement was made between the parties for the shipment on the Dona Aniceta of the glassware from the port of New York to far eastern ports, more particularly to Manila, Cebu, and Hong Kong.

Since 1937 appellee had been a member of the Far East Conference group of carriers, agreeing, by the provisions of the Conference regulations, to ship all his exports by member lines. Appellant was also a member of the Conference. The conference agreement incorporated the carriers' regular form of bill of lading. About the middle of November 1941 appellee filled in the bills of lading for his glassware and sent them to appellant's San Francisco office. With the form of these instruments appellee was already familiar. They provided for the payment of freight by the shipper on delivery of the bills of lading, and they contained the clause: "Prepaid freight is to be considered as earned on shipment of the goods and is to be retained by the carrier, cargo lost or not lost, or if there be a forced interruption or abandonment of voyage at a port of distress or elsewhere."

The Dona Aniceta was originally scheduled to depart November 27, but due to various factors, including fog encountered on the trip from Baltimore where the first of her outward cargo was taken aboard, the vessel did not arrive in New York until December 5. The loading of cargo began 7:00 p.m. December 5, and as had long been this carrier's practice, was continued around the clock until the New York loading was completed at 8:00 p.m. of Decem-

ber 8.[1] The glassware, forwarded by appellee's supplier from a point in Indiana, arrived at appellant's Erie Basin pier on December 1 aboard lighters of the Erie Railroad Company. It was discharged on the pier prior to the hour of 12:45 p.m. on December 7, at which time appellant issued to the Railroad Company dock receipts for the merchandise. These provided: "The Company's regular bill of lading in use by it for similar shipments shall be issued for said goods to the above named shipper. Neither the Company nor the vessel on which the goods are subsequently loaded shall become responsible for the goods as carrier until actually loaded. Until such loading the Company shall be liable for loss or damage only as licensor or bailee and entitled to the benefit of the terms, conditions, exceptions, and limitations of liability and value contained in said regular bill of lading with which shippers are understood to have acquainted themselves."

The glassware was loaded aboard at intervals during the afternoon and night of December 7th and the forenoon of the 8th. Among other cargo laden on the 8th were propeller drive shafts and roller bearings for appellant's use in the Philippines.[2] Some time before 3:00 p.m. on the 7th appellant's port captain, Meredith, in charge of the loading of the Dona Aniceta, received information by telephone from his wife of the attack on Pearl Harbor.[3] The trial court found that none of appellee's goods was loaded prior to Meredith's knowledge of the attack. However, it was agreed on the trial that the loading of the glassware commenced at 1:00 p.m. on the 7th. A log entry by Meredith under date of Sunday, December 7, refers to the Pearl Harbor attack, also to air attacks on the Philippines and Singapore and to the declaration of war by Japan. This entry was actually made on the 8th, and Meredith testified that so far as concerned attacks other than at Pearl Harbor it reflected information acquired by him on the morning of the 8th. Suewer, appellant's New York manager and its American representative, first learned of the Pearl Harbor incident

at 7:00 or 8:00 p.m. on the 7th, having spent the day at an undertaking parlor in attendance on his father's funeral. He testified to having heard nothing that day of an attack on the Philippines. Griffin, appellant's freight traffic manager, heard the Pearl Harbor news over his radio about 2:30 p.m. of the 7th, but did nothing with regard to the Dona Aniceta on that day. Captain Meredith did not consult with his superiors on receipt of the news from his wife but simply proceeded with the work in hand.

Between 8:00 and 10:00 o'clock on the morning of December 8th the customs authorities refused clearance to the Dona Aniceta, as was done in the case of all other vessels in United States ports. The same refusal was received at 2:00 and again at 3:55 in the afternoon of that day. On the 8th Suewer dispatched a cable to the Manila home office stating that it was intended to prosecute the scheduled voyage with concurrence of the Navy, and suggesting that "we again check with you before sailing from the Pacific Coast." No reply was received, although one was expected. According to the testimony of this official as well as that of Griffin and Meredith, there were no changes in the plans for the Dona Aniceta after news of the Pearl Harbor attack. It was anticipated by Suewer that the vessel would proceed under convoy.

On December 9th Captain Meredith telephoned the Coast Guard and asked for instructions to enable the Dona Aniceta to depart. He was referred to a Lieutenant Harvey who told him to paint out all distinguishing marks and to paint the vessel a battleship grey. Meredith purchased the necessary paint on the 9th and the work was commenced on the 10th. Upon communicating with the Naval Port Director's Office, Meredith was referred to Commissioner Vickery of the United States Maritime Commission, and on December 10 was ordered by the Commission to arm and institute "all defense measures." On December 11 the vessel shifted to Pier 45, Brooklyn, for installation of gun emplacements and completion of defense measures,

---

[1] References throughout are to Eastern Standard Time.

[2] The total cargo taken aboard at New York was less than half the vessel's capacity. Other cargo was scheduled to be loaded at Savannah, Los Angeles, and San Francisco.

[3] The attack began at 7:35 a.m., which

was 1:05 p.m. Eastern Standard Time. The record does not disclose the precise hour of the release of the news, but the New York Times of December 8, 1941 states that "because of the time difference, the first news of the bombing was released in Washington at 2:22 p.m."

this work being thereafter done by the United States Navy "by agency of the Maritime Commission." Degaussing[4] of the vessel, initially directed by the Commission, was not done because the work would have entailed the discharge of 'tween deck cargo destined for the Far East. On December 31st the ship, while still at Pier 45, was requisitioned for the Government through the War Shipping Administration and ordered to discharge her cargo.

Meanwhile, on December 11th, appellee was advised by appellant's San Francisco office that his goods had been loaded and that the bills of lading had arrived from New York. He was informed by telephone that they were ready and available to be picked up. The tender was not accepted, although appellee did not then indicate whether he would pay or refuse to pay freight. He simply adopted a waiting attitude. After the ship was requisitioned and unloaded the glassware was stored in New York subject to being taken by appellee upon discharge of the claimed lien for freight.

■ The validity of the prepaid freight clause of the bills of lading is not questioned, nor is it denied that the stipulation shifts from carrier to shipper the risk of a forced abandonment of the voyage. Allanwilde Transport Corporation v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15; International Paper Co. v. The Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318; Standard Varnish Works v. The Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321. Ordinarily, the maritime engagement becomes effective upon receipt and acceptance of the goods by the carrier, though the bill of lading is not issued until later. Ocean S. S. Co. v. United States Steel Products Co., 2 Cir., 239 F. 823. Cf. Pollard v. Vinton, 105 U.S. 7, 9, 26 L.Ed. 998; The Laurent Meeus, 9 Cir., 133 F.2d 552. The freight is considered earned though the vessel did not break ground. International Paper Co. v. The Gracie D. Chambers, supra, 248 U.S. 387 at page 392, 39 S.Ct. 149, 63 L.Ed. 318. The Laurent Meeus, supra, 133 F.2d 552 at pages 558, 559. Here, however, the trial court was of opinion that the terms of the dock receipts prevented the carrier-shipper relationship from attaching prior to loading; and the court thought it an unreasonable exercise of judgment on appellant's part to load the glassware after receipt of news of the Pearl Harbor attack. "Simple realism," it was felt, militated against any expectation that the voyage could be carried out.

■ We find it unnecessary to appraise the effect of the dock receipts.[5] With due deference to the opinion of the trial court, we are not able to agree that the responsible agents of the carrier acted arbitrarily in light of the facts coming to their knowledge while cargo was in process of being loaded. The court is obliged to put itself in the position of the actors, "and not be ready to find that the course actually pursued was blameworthy because the results were unfortunate." The Styria 186 U.S. 1, 9, 22 S.Ct. 731, 734, 46 L.Ed. 1027. What the shipper had the right to demand of the carrier was, not infallibility, but the exercise of a reasoned judgment of the situation as it appeared at the moment, having regard to the rights of all concerned. The Styria, supra, 186 U.S. 1 at pages 9-10, 22 S.Ct. 731, 46 L.Ed. 1027; The Wildwood, 9 Cir., 133 F.2d 765, 767, 768; The George J. Goulandris, D. C., 36 F.Supp. 827; Noble's Explosives Co. v. Jenkins, 2 Q.B. 326, 8 Aspinwall, N.S., 818.

No shipper had requested that the loading of his goods be suspended. Appellee himself made no attempt to halt his merchandise. On the other side, the record is persuasive of appellant's intent to sail the vessel immediately upon completion of the New York loading unless instructions to the contrary were received either from American authorities or from Manila. Its conduct prior to the requisitioning of the ship is consistent only with the purpose to proceed with the scheduled voyage unless subsequent developments should prevent. Suewer testified that perhaps an American or an English line would not have felt as his company did about sailing for the Philippines, but even though such lines might have though it best not to sail, his own, he said, would probably not have followed suit. He testified: "We are a Philippine corporation.[6] We were operating Philippine vessels, that is, vessels documented in

---

[4] Degaussing involves the stretching of electric cables and casings inside of the 'tween decks.

[5] Compare Ocean S. S. Co. v. United States Steel Products Co., supra.

[6] Appellant was at the time financially

the Philippine Islands. On this voyage of the Dona Aniceta we were carrying the usual varied cargo which, particularly in a time of war, would have been invaluable to the receivers in the Philippine Islands. It certainly was our job as a Philippine outfit to do our very best to get these materials to the Islands."

The query is whether this was a reasoned purpose, or whether, however laudable, it was so at war with known conditions as to exhibit mere wishful thinking. Obviously the outbreak of the Japanese conflict posed a grave problem to shipowners, how serious only knowledge more definite than any at the moment obtainable would serve to reveal. It is certain that as of December 7th and 8th the public mind was unprepared for the swift deterioration which was to overtake allied fortunes in the Far East. Shipping news published in issues of the New York Journal of Commerce for the immediate period appear to indicate an intended augmentation of water transportation in the Pacific to meet the Japanese threat. Naturally, insurance rates on far eastern cargo were sharply up. Under a Washington dateline the Journal, in its issue of December 8th, reported "Pacific ships due for full arming," and stated that "convoys are also expected."

Silence from appellant's home office appeared to acquiesce in Suewer's cable of the 8th. As for the current attitude of the government of the United States the orders of the Coast Guard and the Maritime Commission might reasonably be accepted as an indication of official belief in the continued feasibility of the Philippine voyage.[7] The refusal of clearance on the 8th could not be thought conclusive, for the measure affected all shipping and was obviously temporary.

██ Appellee endeavors to bring the case within the decision of this court in Rotterdamsche Lloyd v. Gosho Co., 9 Cir., 298 F. 443, 445, in which it was held that the restraint of princes clause relates to future restraints, not to those already existing. "The undertaking of the carrier," it was there said, "is that he will transport the freight, unless restrained by some future act of government, not that he will transport if present restraints are removed." The argument is that the attack on Pearl Harbor by the government of Japan constituted automatically a restraint on shipping, and that at the time of its imposition no contract of carrier and shipper existed; hence appellant could do nothing to effectuate a contract after the restraint was imposed. The Japanese attack, we think, was not a restraint of princes in the sense of the Rotterdamsche Lloyd decision, where the restraint had been imposed by the Netherlands government on its own nationals and, unknown to shippers, was in effect when cargo was solicited. There is scant resemblance, legally or factually, between the two situations.

In the absence of contrary instructions from shippers it was discretionary with the carrier to complete the loading of cargo without awaiting future developments. Cf. The Styria, supra. The departure of the vessel was already overdue, and it is a fair assumption that most of the New York cargo was on board when the news was received. The trial court made no finding of fraud or active bad faith on the carrier's part, and a study of the record persuades us that such a finding could not stand had it been made.[8]

Two New York decisions concerned with this voyage of the Dona Aniceta have been called to our attention, one of which, at least, tends to support our own conclusion. The first, E. Awad & Sons v. De La Rama Steamship Co., reported in 1942 A.M.C. 1003, is by the Supreme Court, New York County.[9] The other (Tee Ka Chay v. De La Rama Steamship Co., City Court, City of N. Y. 1942) is reported in 55 N.Y.S. 2d 241. Because of the light it throws on the facts of both cases, as well as on the views of the court, the Chay opinion is quoted in full on the margin.[10]

Reversed.

---

obligated to the Philippine Government, and two representatives of that Commonwealth sat on its board of directors.

[7] It is of some significance that as late as December 9th appellant was engaged in negotiations with the United States Army Transport Service looking toward the transportation of automobile trucks on the Dona Aniceta from San Francisco to Manila. These negotiations appear to have been discontinued when delays due to the arming of the vessel interfered.

[8] All testimony for appellant except that of Griffin was by deposition.

[9] Affirmed without opinion by App.Div., 265 App.Div. 913, 38 N.Y.Supp.2d 897, leave to appeal denied, 290 N.Y. 930, 39 N.E.2d 989.

[10] "Documentary evidence makes it plain that the loading of plaintiff's goods

GARRECHT, Circuit Judge (dissenting).

The question here as resolved by the lower court and the majority ·opinion is whether the appellant company exercised reasonable judgment in loading the glassware after receipt of the news of the Pearl Harbor attack. The lower court found that the appellant after the knowledge it had received of the attack on Pearl Harbor did not have reasonable grounds for believing it could proceed with the voyage. The majority opinion does not agree with this finding.

Such findings have the, same force and effect as the verdict of a jury, the same conclusiveness, especially in cases where the important testimony is oral and where the trial judge had the opportunity to observe the witnesses and judge their veracity. Findings of fact will not be disturbed by the appellate court unless they are so clearly contrary to the evidence as to produce in the mind of the reviewers a conviction amounting to a reasonable certainty that they are wrong.

In the lower court's finding that the appellant acted in an unreasonable manner in loading the cargo after the knowledge of the attack on Pearl Harbor, I fail to find clear error. The decision of the lower court should be affirmed.

was completed on December 7, 1941. The case then is not distinguishable from E. Awad & Sons, Inc. v. De La Rama Steamship Co., Inc., Supreme Court, N. Y. County, — Misc. —, 53 N.Y.S.2d 900, Bernstein, J. There, as here, the goods had been loaded before it became apparent the vessel could not sail. There, as here, freight was required to be prepaid and the plaintiff had given his due bill to cover the freight charges. In those circumstances the plaintiff cannot recover the amount of those charges. The principal point made by the plaintiff however (although he has failed to prove the fact) is that loading was not completed until December 8th. This seems not to be the fact, but even if it were

the result should be the same. In the circumstances and in the absence of instructions from the plaintiff to desist loading, the defendant was free to continue loading on December 8th, notwithstanding the events of that day and the day before. The defendant is not assumed to be endowed with prescience and only the gloomiest pessimist, without basis in fact, could take the view that the vessel would not be permitted to sail or that if permitted it could not reach the port of destination. The Styria, 186 U.S. 1, 22 S.Ct. 731, 46 L. Ed. 1027."