UNITED STATES of America, Plaintiff,

v.

WATERMAN STEAMSHIP
CORPORATION,
Defendant.

Civ. A. No. 77–1714.

United States District Court,
District of Columbia.

Jan. 26, 1979.

Allen van Emmerik, Washington, D. C., for plaintiff.

John P. Meade, J. Michael Cavanaugh, Elliot J. Halperin, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GESELL, District Judge.

This is a suit by the Government against Waterman Steamship Corporation ("Waterman") for damages arising out of several contracts for the carriage of goods. The case invokes the Court's admiralty and maritime jurisdiction. 28 U.S.C. § 1333. Waterman counterclaims. After a full trial and careful consideration of the briefs and arguments, the Court makes the following findings of fact and conclusions of law.

In April 1975, Waterman's S.S. SAMUEL CHASE ("CHASE"), a dry cargo vessel of United States registry, prepared for a scheduled voyage to Saigon and other Far Eastern ports by loading numerous shipments financed by the Department of State, Agency for International Development ("AID"), for carriage to Saigon, South Vietnam. After taking fuel at Mobile, the CHASE proceeded to Baltimore, Philadelphia, and New York, loading AID shipments and other cargo at each of these ports. On April 29, while the ship was en route from New York to Houston, Saigon fell to the Viet Cong and the North Vietnamese. On April 30, after the CHASE arrived at Houston, AID issued a vesting order directing Waterman to discharge at New Orleans all AID-financed cargoes which the carrier had loaded for Saigon. New Orleans was the CHASE's last scheduled call before departing for the Far East. AID's vesting order was obeyed.

At the time the Government issued its vesting order, AID had prepaid or was in the process of prepaying the entire cost of freight for the AID Saigon-bound ship-

ments, except those still to be loaded at New Orleans. The sums paid had become due under the terms of Waterman's bills of lading and came to a total of $687,632.04, including $26,925.60 in war risk insurance and $80,817.55 in bunker fuel surcharges.

The Government now contends that these amounts should be returned to it on the ground that Waterman did not act in good faith or use reasoned judgment when it accepted and loaded the cargoes. Plaintiff's position is that, in view of information contained in *The New York Times* or otherwise known to Waterman, the carrier could have predicted by April 1 that Saigon would fall to Communist forces well before the CHASE could arrive in Vietnam and, accordingly, that Waterman acted negligently, if not fraudulently, in having contracted for the carriage of, and loaded, any AID-financed goods for Saigon.[1]

Waterman counters initially by contesting plaintiff's standing to sue in place of the actual shippers of the goods who, though financed by AID, are not before the Court. Alternatively, the defendant contends that the charges which plaintiff seeks to have returned were fully earned, under the unequivocal terms of its bill of lading, when the cargoes were tendered and that Waterman proceeded at all times in good

faith and without knowledge that its call at Saigon would be frustrated.

For the reasons stated fully below, the Court holds that the Government has standing to sue here but has failed to sustain its claim with respect to the great bulk of the freight and other charges it seeks to have returned.

I.

At the outset, it is necessary to outline the precise relationship which existed between the parties during the period at issue, for it was more than the traditional relationship of shipper to carrier. Regulations and documents peculiar to the transportation of AID-financed cargo, as well as the provisions of Waterman's standard bill of lading, must be examined.

Part 201 of 22 C.F.R. contains the rules and procedures which governed the commodity transactions involved here. AID agreed with the Government of South Vietnam to finance the cost of various sales of commodities to Vietnamese importers by American business concerns. Pursuant to this arrangement, Vietnamese businesses placed orders with domestic United States "shippers" for the goods in question here. The shippers then prepared the goods for export and delivered them to Waterman at its several dock facilities. Upon such deliv-

---

1. Throughout the course of this litigation, the Government has also contended that this case is governed by Far East Conference Tariff No. 26 (FMC No. 8), Rule 12. At all pertinent times, Waterman was a party to the Far East Conference, an association of ocean carriers serving the Far East, established pursuant to Agreement No. 17, an agreement which was approved by the Federal Maritime Commission under 46 U.S.C. § 814 on November 14, 1922. Rule 12, as it read during the time period in question, provided in pertinent part that:

If the carrier at his option allows the discharge of cargo at a port of call of the carrying vessel other than the port of call named in the Bill of Lading the following rule applies:

In the event diversion is effected to a port of call to which the rate is other than that assessed, carriers are to adjust freight charges . . . to the basis of the rate applicable to such port.

The Government urges that, by reason of this provision, Waterman may claim only that pro-

portion of the total freight covered by its freight-earned clause as the carriage costs from the various ports of loading to New Orleans bore to all likely carriage costs. After noting that Waterman had no authority to carry cargo from one United States port for discharge at another, the defendant submits a letter addressed to Waterman from J. Meyer, Vice Chairman of the Far East Conference. That letter states that "it is our opinion that the diversion charges and the provision for freight adjustments are only applicable when vessels have been diverted from one discharge port to another in the Far East within the trading area of the Far East Conference." The Court does not find this interpretation to be strained. As a construction by the Far East Conference of one of its own rules, the Court accepts it as presumptively correct; and, since the plaintiff has offered no contrary evidence, the Court finds Rule 12 to be inapplicable to the situation at hand.

eries, "dock receipts"[2] were issued by Waterman and taken by the shippers. Thereafter, Waterman executed a "bill of lading" for the carriage of each batch of goods; this document contained the contract of carriage and, among other things, required the shipper to prepay the entire freight and other related charges.

Under the regulatory scheme each shipper was then directly or indirectly reimbursed by AID for both the cost of the commodities and the cost of carriage. Reimbursement depended, however, upon the shipper tendering to AID or the intermediary bank various documents listed in 22 C.F.R. § 201.52. One such document crucial to the present controversy was a "Supplier's Certificate," signed by Waterman.

The terms of each Supplier's Certificate executed for the shipments involved in this case were specified by regulation. *See* 22 C.F.R. Part 201, Appendix A. By signing the certificate, Waterman consented to the requirements laid out in 22 C.F.R. Part 201, and agreed that it would, "upon the request of AID, promptly make appropriate refund to AID, plus interest . . ., in the event of—(a) His nonperformance, in whole or in part, under" the contract of carriage. Since each contract of carriage was memorialized by a bill of lading, this provision in effect incorporated into a Supplier's Certificate each bill of lading issued by Waterman for the AID-financed Saigon cargo. Through this means, AID obtained the right to hold Waterman to all the provisions of its standard bill of lading.

Under this standard bill of lading and AID's regulations, Waterman and the Government respectively enjoyed several important rights and responsibilities. Waterman, by issuing its bill of lading, agreed to carry all the cargoes in question to Saigon. Balanced against this,

Waterman's standard bill of lading contained a "freight-earned" clause, which provided that the carrier "completely earned on receipt[3] of the goods" by it "[f]ull freight to the named port of discharge and advance charges," the term "charges" being defined to include any expense payable by the shipper, e. g., war risk insurance and bunker fuel surcharges. This freight-earned clause was to be effective even if the "vessel and/or cargo [is] lost or damaged . . ., or the voyage changed, broken up, frustrated or abandoned." Nothing in AID's regulations derogated from or circumscribed the validity of this clause. Secondly, under the "liberties clause" in its standard bill of lading, Waterman reserved to itself the right to depart from its undertaking to carry the goods to Saigon in "any situation whether existing or anticipated before commencement of or during the voyage, . . . which in the carrier's judgment may give rise to risk of damages, delay or disadvantage to the vessel, . . . or make it imprudent to begin or continue the voyage or to enter or discharge at any port, or give rise to delay or difficulty in arriving, discharging or leaving any port or place, or in making due disposition or delivery of the goods . . .."

Waterman's standard "dock receipt" states that the carrier has "[r]eceived the above described merchandise . . . to be held and transported subject to all the terms and conditions contained in the regular form of bill of lading of the carrier which are incorporated herein and shall be considered a part hereof with the same force and effect as if set forth herein in full. The goods are received subject to delay or carrier's inability to carry due to" a lengthy series of conditions. This final qualification in the dock receipt suggests that Waterman's duty to carry the goods

---

2. At Houston, apparently "truckers receipts" were used instead of "dock receipts." No reason appears to the Court to treat these documents differently; the parties do not do so.

3. The parties sharply dispute what event it is that triggers Waterman's freight-earned clause. That clause states that "on the *receipt* of the goods" by Waterman, all freight and other charges are earned. Waterman maintains that "receipt" occurs when "dock receipts" or "truckers receipts" are issued by it for the goods in question. The Government, on the other hand, argues that the freight-earned clause should only be permitted to come into effect when Waterman issues its bill of lading.

does not become full-blown until a bill of lading is executed. Also worth noting is that, under the Uniform Commercial Code, a carrier's duty to exercise reasonable care with respect to goods it undertakes to carry arises when it has "issue[d] a bill of lading." *See* U.C.C. § 7–309. Nothing in the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–15, holds to the contrary. Finally, the Court is aware that Waterman's dock receipts and bills of lading are "contracts of adhesion," and as such must be strictly construed against the carrier. *See Leather's Best Inc. v. S. S. Mormaclynx,* 313 F.Supp. 1373, 1380 (E.D.N.Y.1970), *aff'd in part, rev'd in irrelevant respects,* 451 F.Supp. 800 (2d Cir. 1971). In this light, the documents should not be read to allow Waterman to claim the benefit of its freight-earned clause until it actually assumes some obligation to carry the related goods. For all these reasons, the Court interprets the term "receipt" in Waterman's bills of lading as denominating the time when Waterman actually issues a bill of lading.

On the Government's side, AID had the right to "require that a supplier [such as a carrier, *see* 22 C.F.R. § 201.01(r) & (i)] submit to A.I.D. for prior review any proposed sale of commodities or of commodity-related services which is to be financed by A.I.D." 22 C.F.R. § 201.33. Further, the regulations provided that "A.I.D. may direct that title to A.I.D.-financed commodities in transit to a cooperating country shall be vested in A.I.D. if in the opinion of A.I.D. such action is necessary to assure compliance with the provisions or purposes of any act of Congress." 22 C.F.R. § 201.44(a). Finally, "A.I.D. may direct the master or operator of a vessel . . . carrying the commodities to divert them away from the port or other destination specified in the shipping documents and to deliver them at such other destination as A.I.D. may designate." 22 C.F.R. § 201.44(a)(2). In the event any such "diversion" is ordered, AID is to "assume the responsibility for any extra costs (including the costs of marine insurance and handling) which are incurred . . . .." 22 C.F.R. § 201.44(b)(2).

Thus, AID does not stand as an ordinary shipper. By reserving to itself many special rights, AID's relation to Waterman is one which places Waterman substantially at its command.

## II.

■ The Government has standing to sue because it enjoys an independent cause of action for the breach of any term in the Suppliers' Certificates. *United States v. Waterman Steamship Corp.,* 471 F.2d 186, 188–89 (5th Cir. 1973) (alleged overcharges); *United States v. Framen Steel Supply Co.,* 435 F.Supp. 681, 685 (S.D.N.Y.1977) (allegedly nonconforming goods sold); *United States v. Emons Industries, Inc.,* 406 F.Supp. 355, 356–58 (S.D.N.Y.1976) (alleged breach of undertaking in certificate to conform with FDA law). As noted before, the Supplier's Certificates bound Waterman to the terms of its bills of lading.

In claiming a breach of the Supplier's certificates, the Government of course carries the burden of proof. It asks the Court to infuse a reasoned judgment standard into the freight-earned clause of Waterman's bill of lading. More particularly, the Government argues that Waterman had to exercise reasoned judgment prior to executing each bill of lading; that, once Waterman concluded or should have reasonably concluded that the port of Saigon would be captured by the North Vietnamese prior to the CHASE's arrival, it could no longer proceed in good faith, sign bills of lading, and legitimately invoke its freight-earned clause. The Government would apparently justify the imposition of this standard by pointing to the way in which the Courts have historically interpreted liberties' clauses in carriers' bills of lading. It has been held that "such clauses are subject to the overriding obligation on the part of the carrier to use due care in respect to cargo . . . .." *Orient Mid-East Lines, Inc. v. C. A. R. E.,* 284 F.Supp. 34, 43 (D.D.C.1967), *aff'd,* 133 U.S.App.D.C. 307, 410 F.2d 1006 (1969). Accordingly, in considering liberties clauses the courts have held that "what those concerned have a

**92**

right to demand of a master, when confronted with unexpected emergencies, is not an infallible, but a deliberate and considerate judgment. Mere good faith will not excuse him, if his decision turns out to have been wrong . . . . [The Court must] inquire whether the conduct . . . showed a reasonable exercise of judgment, having regard to the rights of the owners of the vessel and those of the several owners of cargo." *The Styria*, 186 U.S. 1, 9–10, 22 S.Ct. 731, 734–735, 46 L.Ed. 1027 (1902). *Accord, The Wildwood*, 133 F.2d 765 (9th Cir.), *cert. denied*, 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943); *The George J. Goulandris*, 36 F.Supp. 827 (D.Me.1941).

In support of its position that a reasoned judgment standard should be imposed upon a carrier with respect to its initial loading of cargo, as well as with respect to its exercise of any rights under a liberties clause, the Government is able to cite only one case. *De La Rama S. S. Co. v. Ellis*, 149 F.2d 61 (9th Cir. 1945).[4] This was a suit between a shipper and a carrier concerning whether or not the carrier had a right to full consideration under a freight-earned clause. The carrier had loaded the shipper's Manila-bound goods in New York on December 7 and 8, 1941, after hearing of the attack upon Pearl Harbor. By government decree, the voyage was ultimately frustrated; but the carrier insisted that it had earned the full freight. The District Court held for the shipper, but the Court of Appeals reversed. The appellate court found that the carrier did owe the shipper a duty to exercise reasoned judgment prior to loading the shipper's cargo, but found, unlike the District Judge, that the carrier had met this obligation. *Id.*, 149 F.2d at 64. The court concluded that the carrier had had every intention to sail to the Philippines, that no shipper had requested the carrier to suspend its loading of the goods, that on December 7 and 8 "the public mind was unprepared for the swift deterioration which was to overtake allied fortunes in the

Far East," and that the United States Coast Guard and Maritime Commission were at the time acting in a manner consistent with the belief that a Philippines voyage remained feasible. *Id.*, 149 F.2d at 64–65.

■ Whatever may be the possible right of a private shipper to impose this reasoned-judgment standard upon a carrier in derogation of the express terms of the freight-earned clause, the Court has concluded that such a standard should not be imported into the Supplier's certificates involved here. During April 1975, the Government, by virtue of its regulations and the supplier's certificates, stood in a different posture vis-a-vis the carrier than would have the typical commercial shipper. AID enjoyed the pre-screening, vesting and diversionary powers already noted. In addition, the situation in April 1975 was one with respect to which the Government must be presumed to have possessed far superior knowledge. As a result, the commercial bargain between AID and Waterman was not disproportionately balanced in favor of either party, as may in fact be the case in some private shipper bill of lading situations; and both parties entered into their agreement with an equal awareness of the possible risks. Therefore, the Court refuses to impute into the written documents a contractual term that the parties did not themselves place there.

■ The Court must recognize, however, that a carrier's awareness of the likely risks may become so great prior to or while it is signing bills of lading that it may not legitimately execute further bills of lading, and then claim title to the full freight under those bills' freight-earned clauses. One should not be entitled as obligor to the full contract price because one's performance is frustrated by the occurrence of an impossibility which one knew at the time of contracting would arise. *See* A.L.I., Restatement of the Law of Contracts 2d, Tentative Draft No. 9 (April 8, 1974) § 286(1)

---

4. The *De La Rama* decision appears to be the only case which has applied this standard. It must itself be viewed as having departed somewhat from the state of the law as it then exist-

ed, for all the cases cited in the decision involved the application of the reasoned judgment standard to a carrier's exercise of its liberties clause.

("Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary."); *The Wildwood*, 133 F.2d 765, 767, 771 (9th Cir.), *cert. denied*, 319 U.S. 771, 63 S.Ct. 1436, 87 L.Ed. 1719 (1943), (for a carrier properly to invoke its liberties clause, it has to be faced with a risk substantially greater than the risks anticipated at the time of contracting); *Surrendra (Overseas) Private, Ltd. v. S. S. Hellenic Hero*, 213 F.Supp. 97, 98–99, 102 (S.D.N.Y.), *aff'd*, 324 F.2d 955 (2d Cir. 1963) (to the same effect). Accordingly, the Court concludes that, once Waterman actually knew or had to have known with certainty that Saigon would fall to the Communists in the immediate future, it could no longer sign bills of lading that properly triggered its freight-earned clause.

### III.

The largely undisputed events must be reviewed in this context. The CHASE was expected to take from 45 to 60 days to sail from New Orleans to Saigon. Another Waterman vessel, the S.S. THOMAS JEFFERSON, was enroute to Saigon while the CHASE was loading at United States ports and indeed was due to call at Saigon toward the middle or latter part of April. Both voyages were carefully monitored by Ryan, a Waterman vice-president based in New York City, who was an experienced shipping executive familiar with operating conditions in the Far East. He was responsible for the voyages of the JEFFERSON and the CHASE, and as a result was forced to make many difficult decisions from day-to-day.

Waterman's officers and employees in Washington and Saigon made daily inquiries of knowledgeable officials in the Department of State and the Military Sealift Command to learn about conditions in Saigon. All such information was passed along to Ryan. Ryan also had frequent communications with Waterman's various representatives and employees in Saigon and Manila and he read *The New York Times* daily. In this manner he attempted energetically and persistently to keep in close touch with current port conditions at Saigon.

Throughout April, the reports that Ryan received from Washington were consistently the same. Operations at the port of Saigon were said to be normal and the river secure. It was, in fact, the policy of the Department of State and the United States Government generally not to discourage the loading of vessels for Saigon even as late as April 24–25, when, unknown to Waterman, the ultimate vesting order began to be drafted. Ryan was aware that the Government knew that the CHASE was loading AID-financed shipments. No representative of the Government ever stated or suggested to Waterman that it should stop loading the CHASE for Saigon. On the other hand, no representative of Waterman ever specifically asked any Government official in Washington whether or not the CHASE's loading should continue or sought any official prognosis as to the likely state of affairs at Saigon in June when the CHASE was scheduled to arrive.

The reports from Waterman's active representatives in the Far East were also always to the effect that the port and river were secure. The JEFFERSON made a normal call at Saigon on April 19. The port was secure, stevedores available, and no security problems were encountered. Saigon, in fact, was not closed to American ships until the very end of the month.

By early April some United States carriers were deciding not to call at Saigon. Waterman knew this. There is no direct evidence on why these decisions were reached. Ryan did not inquire directly of his competitors for their reasons. The Department of State believed and Ryan was informed by his own representatives that the carriers' decisions were based on rising war risk insurance premiums and not on the likelihood that the port would be closed in

short order. Waterman, the principal United States carrier to the Far East was operating older, less valuable vessels to Saigon and knew that it did not have to meet the same higher war risk premium charges.

Ryan, of course, learned from his representatives in Manila and Saigon and from his reading of *The New York Times* that the military situation in South Vietnam was deteriorating and that there was tense uncertainty as to Saigon's future. But nothing definite could be discerned until near the end of the month from these sources— as *The New York Times* reports, which are summarized in the Appendix hereto, disclose.

The future of Saigon was indefinite during close to the entire period the CHASE was loading on the East Coast of the United States. The CHASE completed loading at Baltimore on April 18, at Philadelphia on April 21, and at New York on April 25. The fortunes of the opposing forces in Vietnam vacillated during this period, various governmental and diplomatic initiatives gave momentary cause to expect the course of events might change, and the intentions of the North toward Saigon were in some doubt, dependent in part on success or failures in other battles. In short, the situation during most of April was volatile and highly unpredictable.

In the light of hindsight, it is now easy to point to passages in the newspaper accounts that presaged the ultimate collapse and to read all optimistic reports as naive, misguided or wishful. The benefits of hindsight were, however, not available to Waterman during the month of April 1975. There is nothing in the record to indicate how thoroughly or perceptively Ryan read the newspaper. Yet, one can realistically suppose that he knew that Saigon had at the beginning of 1975 one of the best equipped military forces in Southeast Asia; that this force had been trained for years by top United States military advisors; and that it would probably fight most vehemently around Saigon. A reasonable person standing in Ryan's shoes could justifiably have believed throughout most of

April that Saigon might well hold out for months, if not years. Such a person cannot be expected to have accurately appraised the depths to which Saigon's fighting forces had so quickly collapsed during the first few months of the year or predicted that Washington would permit this turn of events to run its natural course. The newspaper reports themselves contained no predictions of Saigon's fall until near the latter part of April.

Under all these circumstances, the Court finds that Waterman knew or had to have known with certainty that Saigon's fall was imminent after Ryan read *The New York Times* of April 23 or April 24. The factors which have led the Court to this conclusion include: the fact that the United States Government did not itself begin drafting the vesting order until April 24; the report in April 23's paper that Xuan Loc had fallen and that the Viet Cong were deriding Saigon's peace initiatives; and President Ford's statement, reported in the April 24 paper, that the Indochina war was finished for the United States.

In sum, the Court declines to imply the reasoned judgment standard as part of the Supplier's Certificate and holds that Waterman is entitled to the full freight and charges covered by its bills of lading for AID-financed cargo—except with respect to those bills of lading which it executed after April 24.

## IV.

The Court would reach the same conclusion in this case even were it to adopt the *De La Rama* rationale and hold Waterman to a reasoned judgment standard with respect to the execution of its bills of lading. Waterman had an obligation under its bills of lading to carry AID's cargo to Saigon and was aware that, by meeting this obligation, it would be fulfilling one important objective of the United States' foreign policy. Waterman also knew that if the course of events did close Saigon's port to American carriers, but did not lead immediately to Saigon's surrender, the possibility always existed of transshipment by non-United

States carriers or diversion to another country on Government orders. Waterman kept the Government fully aware of what it was doing, knowing that the Government enjoyed far superior knowledge with respect to the potential course of events in Vietnam. Under these circumstances, it was an exercise of reasoned judgment on Waterman's part to continué to issue bills of lading with respect to Saigon-bound cargo until it knew with certainty that Saigon would shortly surrender to the Communist forces.

The Government characterizes this course of conduct as lacking in reasoned judgment and perhaps as even bordering on fraud, insisting that Ryan had a duty explicitly to request his Government sources to make predictions and himself to make a definite prognosis from day-to-day as to whether Saigon would or would not be open to traffic in June. This is a wholly unrealistic hindsight view of the situation and ignores the fast-moving and harried conditions under which Ryan was constantly operating. Ryan was not obliged to survey the situation with the precision and analysis required of a military or political expert. He did the best he could knowing the Government wanted the goods carried if at all possible. It was an exercise of reasoned judgment to proceed through April 24 and he did so in good faith.

### V.

All AID Saigon cargoes loaded at Baltimore and Philadelphia were covered by bills of lading dated prior to April 25. Waterman may keep these cargoes' full freight.

With respect to the AID Saigon cargoes loaded at New York, the Government is only entitled to be reimbursed for the full freight covered by bills of lading dated April 25 or thereafter.

All AID Saigon goods loaded at Houston were covered by bills of lading dated after April 24. The Government shall be reimbursed for the full freight of these cargoes.

Waterman received the Government's vesting order on May 1, prior to loading any AID Saigon cargo at Houston. The order advised Waterman that "any cargo loaded for Vietnam that can be discharged at a United States port of call should be so discharged, if stowage permits  . . .." [5] Pursuant to this message, the CHASE loaded all AID Saigon cargo received at Houston and sailed on May 3 for New Orleans. It did so on the basis of a reasonable interpretation of the Government's vesting order: the order was ambiguous and Waterman apparently had no storage facilities at Houston. Waterman therefore is entitled to be reimbursed for the actual costs it incurred in loading all AID Saigon cargoes received at Houston.[6]

█ The defendant has pled a counterclaim in recoupment, which was filed by permission of the plaintiff and by leave of the Court, and submitted orally at the time of trial. The claim seeks recovery from the Government for the full freight covered by bills of lading issued by Waterman on April 22 for AID-financed Saigon-bound cargo to be loaded at New Orleans. This cargo was never actually loaded aboard the CHASE since the vesting order was received before Waterman called at the port. As a claim for affirmative relief against the Government, the counterclaim would be barred by the applicable statute of limitation. 46 U.S.C. § 745. The defendant, however, presents it as a claim in recoupment. Since

---

5. Shortly thereafter, Waterman suggested that it unload all AID Saigon commodities at New Orleans. The Government apparently never raised any objection to this proposal.

6. The Government may not recover the stevedoring expenses it incurred in unloading AID Saigon cargo at the port of New Orleans. Most of these expenses resulted from the legitimate acts of Waterman in loading cargoes covered by pre-April 25 bills of lading or at Houston.

The Government might be said to deserve reimbursement for unloading the New York cargoes for which bills of lading were issued by Waterman after April 24. No proof, however, has been submitted on how much this may have cost, even though the theory of the plaintiff's case in chief would have required such proof. The Government must, therefore, fail on this account as well.

the claim concerns the very transaction which is the subject-matter of the plaintiff's action, it is not time-barred. *Bull v. United States*, 295 U.S. 247, 262, 55 S.Ct. 695, 79 L.Ed. 1421 (1935); *United States v. Wessel, Duvall & Co.*, 115 F.Supp. 678, 686–87 (S.D.N.Y.1953). Consequently, to the extent the Government receives any affirmative relief against the defendant as heretofore delineated, the defendant may offset this by the amount of its counterclaim, which was shown by the proof to be $44,829.22.

The parties shall submit an agreed form of judgment carrying out the foregoing within ten days.

SO ORDERED.

## APPENDIX

The following is a resumé of information appearing in *The New York Times* in April.

*April 1*—An attack on Saigon is feared (Defense Secretary Schlesinger sees it as coming within two months) and doubts are cast on the morale of Saigon's defenders. North Vietnamese forces are surging through the central coastal area north of Saigon.

*April 2*—Communists are reported as still advancing. Qui Nhon, South Vietnam's third largest city, is abandoned. While the South Vietnamese forces are demoralized and being overrun, Saigon is pictured only as a possible target. Although some Americans are quitting South Vietnam, the United States denies any evacuation orders.

*April 3*—Fear is reported to be sweeping Saigon as combat erupts closer to the city. Nha Trang and Cam Ranh Bay are reported lost. South's troops are being exhorted to stiffen defenses. Peace talk offer by Viet Cong is made in Paris. An offensive against Saigon is foreseen within five days by United States military sources and Schlesinger says 30 days will determine whether South Vietnam can survive.

*April 4*—Pentagon expects the North's drive to isolate Saigon region. Pentagon officials are pessimistic and resistance is being measured in terms of days, not weeks. But, Army Chief-of-Staff Weyand confident that RVN army still has capability to defeat the North Vietnamese.

*April 5*—Communists units are probing defenses around Saigon and United States military men doubt Saigon turnaround.

*April 6*—Hanoi steps up attacks in Mekong Delta area south of Saigon, but eases pressure in area northwest of Saigon. United States reassessing its policy; but Kissinger sees possibility of South Vietnamese military stabilizing the situation. France appeals for a peace process in Vietnam.

*April 7*—There is shelling near Saigon but the government still holds two other key ports.

*April 8*—Military activity in the Mekong Delta increases and there is a rising tide of fear in Saigon. Military gain reported for South Vietnamese forces in area northwest of Saigon.

*April 9*—It appears that Hanoi forces are attempting to cut off food supplies to Saigon. There is commando action in vicinity of Saigon. General Weyand proposes urgent arms aid to defend Saigon.

*April 10*—Main thrust against Saigon is expected from the North and Communists are tightening grip on approaches to Saigon.

*April 11*—President Ford asks Congress for $972 million in aid for Saigon since matters at a crisis stage. Seeks to halt fighting diplomatically. Fighting continues heavy in the South and outcome of defense of other key cities, particularly Xuan Loc, viewed as indicating South's will to defend Saigon. Reports from military areas state that RVN forces not abandoning territory as had during earlier weeks. United States Embassy in Saigon told to begin staff reduction. Hanoi is reported aiming to avert bloodshed by fighting in field, not in Saigon.

*April 12*—Congressional resistance develops to President Ford's request. South Vietnamese forces reportedly pushed Communist troops out of key city of Xuan Loc.

*April 13*—Saigon reports gains at Xuan Loc and on key road southwest of Saigon. Fall of Saigon may depend on Xuan Loc. Communists still moving toward Saigon. Concern is expressed that there may be uprisings within Saigon itself unless Thieu resigns.

*April 14*—Reds renew drive to capture Xuan Loc. Fighting intensifies. Stand by Saigon troops slows Communist drive; troops seen as holding their own. Thieu reported planning a counter-offensive.

*April 15*—Saigon hopes its forces can end Xuan Loc siege, where they were still holding off the Communists. Saigon government seems virtually paralyzed.

*April 16*—Three more divisions of Communists reported moving into battle around capital. Americans are leaving Saigon. South Vietnam's largest air base at Bien Hoa is shelled.

*April 17*—Saigon peril grows as troops near Xuan Loc fall back. Another port city, 170 miles northeast of Saigon, abandoned by South Vietnam. Viet Cong demand United States pull out of Vietnam.

*April 18*—Saigon apparently bracing for a direct thrust by foe; but its troops reported still holding at Xuan Loc and, in fact, making gains in area. Further United States military aid rejected by Senate committee. Reston reports that Saigon prepared to negotiate a political and military settlement.

*April 19*—Kissinger and Army Chiefs at House hearing see collapse for Saigon. President Ford request for military aid stalls but idea of humanitarian aid gains in Congress. South Vietnamese forces reported to be still holding onto Xuan Loc. Western intelligence officers expect full-scale North Vietnamese thrust at Saigon in the next few days. Mounting indications exist that Administration does not expect South Vietnamese Government to survive into May. Yet, Soviet diplomats reported as saying that they do not expect Communist forces to try to capture Saigon and win the war in the current offensive.

*April 20*—Communists take last central coast town in South Vietnam. Viet Cong hint that it may delay expected military onslaught against Saigon to allow time for a peaceful conclusion of the war. Most military analysts believe that Communist strength around Saigon is now so overwhelming that the capital could be taken in days or hours.

*April 21*—Reds make moves to cut off Saigon but attacks ebb. Lack of action near capital follows hint of changed tactics. It is apparent that effort is going to be made to seal off Saigon from rice-producing Mekong Delta region. Xuan Loc reported as still in South Vietnamese hands.

*April 22*—Thieu resigns, appointing his Vice President to replace him. Kissinger opposes an immediate pullout by United States. Immediate evacuation of Americans being considered because situation in South Vietnam deteriorating so rapidly. Saigon defenses reported as fading. Fighting in Vietnam, however, virtually ·ceases upon Thieu's resignation.

*April 23*—Saigon negotiating some kind of truce which Viet Cong deride. Fall of Xuan Loc.

*April 24*—Panic rises in Saigon but exits are few. Congress votes humanitarian aid for Saigon and authorizes use of troops for evacuation. Indochina war finished for America, Ford says.

*April 25*—United States seeks to speed flow of refugees from Saigon. Viet Cong indicate that they would accept Big Minh as leader of Saigon. Military observers have no doubt that attack on Saigon would be shattering. President Ford saying that approval of additional military aid would help stabilize situation.

*April 26*—Vietnam airlift goes on. United States confident on its ability to carry out evacuation. *Times* notes Saigon not yet attacked and 1300 Americans remain in city.

*April 27*—Five rockets hit capital.

*April 28*—Red Forces within mile of Saigon as tanks and artillery close in. Big Minh named to head Saigon government.

*April 29*—United States withdrawing Americans from Saigon. Saigon's airport attacked by rockets as North Vietnamese troops assault parts of the city's suburbs. Viet Cong reject Big Minh's peace proposal.

*April 30*—Minh surrenders unconditionally; Viet Cong in Saigon.